## SNELL *v.* STATE.

[69 South. 593.]

HOMICIDE. *Evidence. Dying declarations.*

> Where the physician of deceased did not suggest to him that he was going to die, but stated to him that it was doubtful what would be the outcome of the injury which deceased had sustained, as deceased about the same time, which was two or three days before his death, said to his nurse, I will never get up. Under such evidence a declaration made by deceased that he was shot by accused should not have been admitted in evidence as a dying declaration.

APPEAL from the circuit court of Perry county.

HON. J. M. ARNOLD, Judge.

William Snell was convicted of murder and appeals.

Will Snell, a negro, having been convicted of the murder of another negro, Hosea Hicks, and sentenced to imprisonment for life, appealed to the supreme court; his chief ground for reversal of judgment being pred-

icated on the admission in evidence, on his trial, of
the testimony of a state's witness, Virgie Bolton, rela-
tive to alleged dying declarations made to her by
Hicks as to the cause of his death. Snell was con-
victed on circumstantial evidence. Hicks, while at the
home of the appellant, Snell, was shot in the back, and
a few moments after the shooting Snell appeared at
a dwelling house near by, stating that Hicks had shot
himself, and requesting that a physician be summoned.
Snell and his wife disappeared a very short while
thereafter, but he was later apprehended and held
for the crime. Hicks lived for about nine days after
receiving the injury, and discussed the shooting with
different persons, and according to the testimony of
these persons, as witnesses for the defense, he stated
that the shooting was accidental. Hicks died on a
Saturday. On Wednesday or Thursday (the exact
day being uncertain) Hicks' physician stated to Hicks
that it was doubtful what would be the outcome of
the injury, but did not at any time suggest to Hicks
that he would die as a result of his injury. Later, on
either Thursday or Friday (the time not being definitely
fixed), Virgie Bolton, while in attendance at the bed-
side of Hicks as a nurse, was requested by Hicks to see
if his wound was bleeding, and, when she stated that
she could not tell, Hicks (according to her testimony)
stated to her: "I will never get up. I did not shoot
myself, but Will." Being further interrogated by the
district attorney on the stand, in answer to the dis-
trict attorney's question, "Did he (Hicks) say any-
thing to you about going to die?" she testified, "Yes,
sir; he didn't exactly say he was going to die; he said
he would never get up from there; and he said, 'No,
I didn't shoot myself;' and I asked him who shot him,
and he said, 'Will.'" Counsel for the accused ob-
jected to the admission of this alleged dying declara-
tion, but it was admitted to the jury.

*E. W. Breland,* for appellant.

The admission by the court of this alleged dying declaration is so manifestly erroneous, in my judgment, that I hardly believe authorities touching the question of the admission of dying declarations that have been so uniformly and persistently adhered to by this court, is at all necessary. But, permit me to cite the case recently decided by this court of *Reeves* v. *The State,* 64 So. 836, in which the court held that a declaration made by the deceased, after his attending physician had told him he could not recover, was not admissible, where there is nothing to show that he is then about to die.

See also, *Fannie* v. *State,* 101 Miss. 378, in which this court said, that in order that a dying declaration may be admissible in evidence it must appear beyond a reasonable doubt that he made it under the realization and solemn sense of impending death. The declarant at the time of making the declaration must have had no hope, however slight, of recovery.

See also, *Guest* v. *State,* 96 Miss. 871, in which case this court sets out in full and especially emphasizes the rule and requirement for the admission of dying declarations. See *Brandon* v. *State,* 99 Miss. 784; *Joslin* v. *State,* 75 Miss. 838; *Bell* v. *State,* 72 Miss. 507; *Astley* v. *State,* 37 So. 960; *Starks* v. *State,* 6 So. 843; Underhill on Criminal Evidence, page 191; 2 Wigmore on Evidence, page 1805.

*D. K. McDonald,* for appellant.

During the trial of the case the state offered evidence of a statement made by the deceased on Thursday or Friday before he died on Saturday to Virgie Bolton, purporting to have been a dying declaration. The court admitted the statement over the objections of the defendant. The statement if ever made by the de-

ceased was in no sense a dying declaration and should not have been admitted. A statement to be admissible as a dying declaration must have been made in a solemn sense of impending dissolution. The declarant must realize that the approach of death is near at hand. There is nothing in the statement to indicate that the deceased realized that he was going to die, or that death was far or near. The only thing that this negro woman heard the deceased say was that he "was not going to get up." She testified that the deceased called her to his bedside and asked her if he was not bleeding and in answer to his request, she could not tell; then she asked him how he came to shoot himself anyway, and in reply to that question the deceased stated that he did not shoot himself. "Will shot me." The court will notice that the deceased did not call this old negro woman to his bedside for the purpose of making a dying statement about the cause of his death. The hope of recovery certainly had not left him or else he would not have called for his nurse when he thought that his life might be endangered by the loss of blood. Why? It is a common expression among those who are suffering great pain to say that they can't live or that they will never get up, etc. Furthermore, we are unable to tell from the statement made conceding it to have been made, or conceding it to be true whether the deceased expected to be a paralytic and linger for many years or whether he thought his life would be cut unusually short by the wound that he had received. This court has held repeatedly that such statements are not admissible and I think it wise for so holding. See *Reaves* v. *State,* 64 So. 836; *Fannie* v. *State,* 101 Miss. 378, 58 So. 2; *Brandon* v. *State,* 99 Miss. 784, 56 So. 165; *Guest* v. *State,* 96 Miss. 871, 52 So. 211; 78 Miss. 637, 29 So. 519; 75 Miss. 838; 70 Miss. 742.

The court should have granted the defendant a peremptory instruction at the close of the taking of tes-

timony as asked for by the defendant. The statement purporting to be a dying declaration being inadmissible there was no question of fact to go to the jury. The court should have sustained the motion of defendant to set aside the verdict of the jury and granted the defendant a new trial. The verdict is contrary to law and not sustained by evidence. See 67 Miss. 330; *Owens* v. *State*, 80 Miss. 421; *Sykes* v. *State*, 89 Miss. 766; *Brown* v. *State*, 81 Miss. 143; *Middleton* v. *State*, 80 Miss. 393; *Allen* v. *State*, 88 Miss. 159; *Harris* v. *State*, 71 Miss. 462; *Jones* v. *State*, 91 Miss. 868, 45 So. 145.

*Geo. H. Ethridge,* Assistant Attorney-General, for the state.

The law of dying declarations is thoroughly settled in this state and since the decision of *Bell* v. *State*, 72 Miss. 507, and *Lipscomb* v. *State*, 75 Miss. 559, there can be no doubt about the law bearing on this subject. It is always a difficult question to determine whether or not the conditions exist upon which they may be admitted considered purely as facts. It is argued that the statement made in this case is not susceptible of the construction that the deceased knew at the time that he was *in extremis.* Of course we are not confined entirely to the precise language used, but this must be viewed and construed in the light of surrounding circumstances, I think the language used would naturally be construed to mean that the declarant had abandoned all hope of recovery. There is no expression of hope shown. It does not appear that he had anywhere discussed the question of being paralyzed, or that he even knew that would probably or even possibly be a result of his wound. If the shot leg were paralysed it would not prevent his getting up, for with one leg paralysed he would be able to get around on crutches. The attending physician, who certainly was

not friendly to the prosecution testified that he had from the beginning discussed the seriousness of the case with the deceased and told him he could not tell what would happen or what complications would set up. The nature of the wound itself was such that but few people would entertain hope even from the beginning, and with the passing of days it is apparent that the wound grew worse. While the deceased seemed first to believe that the wound was not fatal it is ap-. parent that no hope was held out to him, by physician or those who were ministering to his wants. It must be admitted that this case presents a close question on the facts, and would have been more satisfactory if the circumstances had been more fully developed, but I submit that any reasonable, mind, freed from the technical learning on the subject, would have reached the conclusion from the language used and the surroundings generally that the deceased had abandoned all hope of recovery.

SMITH, C. J., delivered the opinion of the court.

It cannot be said from the evidence that the deceased's condition and state of mind at the time he told Virgie Bolton that defendant shot was such as to bring the statement within the rule governing dying declarations; consequently, it should not have been admitted.

*Reversed and remanded.*